Good morning, your honors. May it please the court, I represent the plaintiff Carol Manstrom, William Manstrom Greening's mother and the personal representative of his estate. I'd like to reserve three minutes if I can for rebuttal. I'm going to address the issues on appeal in the following order, the negligence claim against the defendant Greening, the state created danger claim against defendant Greening, and the ratification claim against Lane County. On February 13th, 2017, the defendant Glenn Greening, an armed parole and probation officer, deliberately left his loaded duty weapon on a desk in the living room of the house he shared with his 18 year old son, William, and went to bed. Later that in dismissing the negligence claim on the basis that William's death was not foreseeable, the district court committed reversible error. Under Oregon law, foreseeability refers to the generalized risk of the types of incidents and injuries that occurred, not the predictability of the actual sequence of events. The record evidence and common sense inform us that unauthorized access to a loaded firearm creates a wide spectrum of foreseeable harms to others and that suicide is among them. Foreseeable harms in this case fall into two categories. The firearm may accidentally discharge and injure someone or the firearm may be used in to intentionally harm someone or oneself. To Both of these categories of risk are within the community's general knowledge of the way harm from unauthorized access to a loaded firearm may occur. In Stewart, the community's general knowledge of risks associated with fighting a negligently caused fire was sufficient to make the foreseeability of an injury to a volunteer firefighter on the roof of an adjoining building who fell through a concealed skylight a jury question. In this case, the community's general knowledge of the risks associated with leaving a loaded firearm accessible and unintended make the foreseeability of William's suicide a jury question. The is illustrated by Lane County's own suicide prevention website which identifies access to a firearm as a risk factor for suicide. We've also put in the record a 1993 study published in the American Journal of Diseases of Children titled Firearms and Adolescent Suicide. That study documents the association between adolescent suicide and access to a firearm. Indeed, that study recommends that pediatricians inform parents that the presence of firearms in the home may be associated with adolescent suicide even in the absence of clear psychiatric illness. In the record in this case, there is a pediatric parent advice sheet from William's age 16 annual checkup. In that document, the pediatrician directs the parents to lock up all guns in your house. It's a standard warning on pediatric advice to parents. So that warning was not specific to William the way you put it, that this was a standard item on a pediatric exam. Is that correct or not? It's correct, your honor, that it is a standard item on a pediatric exam and it was the advice sheet handed to William's parents at the end of his examination. And finally, both the in terms of general knowledge, both the CDC and the of reducing suicide by adolescents and young adults. I ask you to just to remind us that the rationale for the district court's decision, excuse me, what rationale for the district court's decision, as I understand it, is that William's suicide, suicidal ideation, his suicidality was not known to the parents. There just weren't enough red flags beforehand to, I guess, tip off the father that this might be imminent. Is that the gist of it? Well, I don't even think that the district court looked for red flags because there were red flags. In the record, we have evidence following William's suicide that Mr. Green made the statements, I'll never forgive myself for leaving the gun out. And the context of that statement takes place with Mr. Greening being aware that one month earlier, before the suicide, William had lost his first love. The context is that a young girlfriend that he had at high school. The context is also the father, Mr. Greening, was concerned about William's estrangement from his mother and his isolation of himself at home. So there were these recent in time to the event flags. And then there was Mr. Greening's knowledge of his son's peculiar vulnerability, emotional vulnerability, based upon several adverse childhood experiences that are documented in the record. Okay, but your position, I gather from the briefs, is that none of those red flags is really a necessary component of your case. It's enough just that the general risk that something bad would happen with a loaded gun left unattended in the home. That alone is sufficient. You would not need to put on any evidence of the vulnerability perhaps to suicidal ideation that William might have experienced, right? None of that is, in your view, is ultimately relevant? Not to the, I believe that's a fair statement of our position on the Oregon law of common law negligence, Your Honor. And I think we cited Piazza versus Killeen. And that's the rotary student that was shot while standing out in front of a teenage nightclub called The Zone in downtown Portland. And the court in which leaving the, the court found that they, this schizophrenic person with a grudge against young people came and shot at and killed a rotary student that was waiting in line to get into the club. The court found sufficient foreseeability of that event in that case because the club was aware that prior shootings had occurred in the area and that there was a danger of assault simply associated with that area. And that's an analogous circumstance to an awareness of the dangers associated with a loaded unattended firearm. What if, what if William had been substantially older? Would that change the analysis in your view? It would not. And I think there's record evidence that supports that as well. So that record evidence has to do with how Lane County parole and probation officers are required to treat their firearms in their own workplace. And in their offices, who are familiar with handling weapons, yet they're required, if that weapon is not on their person, that they store it in a lock box. And the record evidence is the reason for that rule is the risk of accidental discharge or individuals unfamiliar with those weapons or probationers coming through the office accessing those weapons without authorization and creating risk. Okay, but what I hear you saying then is that as you understand Oregon negligence law, if you as a gun owner leave a loaded firearm unattended in your home, you are potentially responsible for basically anything bad that happens with the gun, whether it's accidental or intentional, whether it's an adult, a child. That's that's what I hear you saying. That's because it's all foreseeable. That's what whether accidentally or intentionally, and if you leave your gun unattended, and it's loaded, you every harm that falls, you know, that follows from that is potentially foreseeable. Is that what you're saying? Yes, it's a dangerous instrumentality. So the characteristic, the inherent characteristic of that loaded weapon is a danger just like an unmarked hole in the wrist, that someone may steal your car and drive it recklessly, or that someone may unwittingly step into the unmarked hole. The same is true of that loaded weapon. It can be knocked off the counter by a cat or a dog, go off and hurt somebody. Somebody can break into your home and use it against you, which is one of the risks that was presented by the location this gun was left in the house in this case, or a your family member, who you may not perceive as at risk, may be at risk and access that weapon and use it to commit suicide, which is what happened here. Those are all foreseeable risks under Oregon law. If my bottom line of your argument is that it's a jury, it should be a jury determination. Is that correct? That's correct, Your Honor, there's sufficient facts and the jury should be making the call, whether or not this harm was a foreseeable consequence of leaving that gun out. The jury would also have to decide whether it was negligent at all, in the sense that he might say, you know, no reason to think there was a problem with anyone else in the house, it's convenient to get in the morning. The jury could find no negligence, right? That'd be within the jury's province. Absolutely, Your Honor. And the reverse is also true based upon the expert testimony that is in the record from Dr. Lipson. So Dr. Lipson talks about what's called a weapons effect, which is the more you're exposed to a weapon, the more to be misused, or to take one's life. And that the documentation, the studies in the record, the CDC support the fact that being exposed to that weapon is a risk factor for suicide. So the jury could, it's not a matter of passing, I think that what one of the errors the district court made was drawing the inference that the passage of time indicated that the risk of having that loaded weapon sit around in the home, around the sun, demonstrated a dissipation of risk. Whereas there's record evidence through expert testimony, CDC studies, and positions that the reverse is actually true. And which inference of those two That's what we're saying in this case. All right. Do you want to state the balance of your time for rebuttal? Yes, Your Honor. Okay. Let's turn to the appellees. And I believe Mr. Moore, you're going to go first? Mr. Moore? Here. Am I unmuted now? Sorry, Your Honor. Yes. Thank you. The counsel tries to put into our lap that we're drawing a bright, a bright line that suicide is unforeseeable as a matter of law. That is not what we're contending. Instead, it's the plaintiff that seeks to draw a bright line to the effect that having a loaded, unsecured weapon in a house is, as a matter of law, negligence. Neither of those positions in Oregon, under Oregon's negligence law, is true. Instead... I thought he was saying that there's enough evidence here that it's a question for the jury, that it shouldn't be decided as a matter of law either way. That's what he's claiming. But in analyzing whether or not, as a matter of law, negligence can or cannot occur, you start with the overwhelming fact and the shocking and unique act of a suicide. Then you move to looking at whether or not there are special circumstances in this particular case which would trigger foreseeability and causation under the Oregon law. In the cases where the courts have looked at this and that are analogous, including that, you know, cited the Stewart v. Jefferson case, there has to be something that indicates that there was a special circumstance to take away the impact or effect of the suicide as the key act that caused this damage. Those cases normally go on questions of whether there was a known suicidal person within the home. Was there a toddler? Were there kids underage that, as one of the cases pointed out, that it's known by parents that kids don't always obey rules. They make bad decisions and things like that. You look at whether or not there's a person who has exhibited behavior that indicates they have psychological issues or a person who has indicates in their reply brief that we do not deal with the impact of the Fraker case. But in the Fraker case, the court, in order to indicate that the trial court made a mistake by granting summary judgment, pointed to the fact that the defendant knew that Fraker, the individual who let his car be used by the person who went over and with a gun threatened the children and his ex-wife. The defendant in that case knew about the history of that individual of breaking into the plaintiff's house and knew that that individual was alarmed about the prospect of going to prison. And he knew that Fraker, the individual, had threatened the plaintiff's lives and his own life several times and failed to address these threats to authorities. And that individual made his car available to Fraker after seeing a gun was placed in the trunk. The Stewart case is also really interesting because it completely, the analysis given by the plaintiff in this case, completely ignores what Stewart is saying. And what Stewart is saying is, look, you negligently caused a fire. You know that a fire is a really dangerous, like Mr. Park says, instrumentality. And you're going to have firefighters who come out and fight it. They're going to run across situations they have no knowledge of. They're going to be rushing in to control the fire. Of course, it is within the general foreseeability that they're going to get injured. What is not foreseeable is that a firefighter's wife will emotionally lose control watching him fall through the skylight and rushes in and causes harm to herself. What is also, again, that's an intentional act. What is also not foreseeable, it is not foreseeable, there could be spectators there because fires draw spectators. It's foreseeable that a burning piece of debris could hit a spectator. That could be within the scope. It is not foreseeable that a spectator will pick up a piece of burning debris, throw it on another a little bit different. But Oregon doesn't get rid of the requirement that there be a negligent act, that there be foreseeability, that it be within the zone of expectations. None of those are missing. And it's for the court. Let me ask you, let me ask you to just cut to the chase in terms of your position. I gather you would agree that if William had been a six-year-old and had accidentally shot himself with a gun, that that would be foreseeable? Yes. I think that under Oregon negligence law, it would be foreseeable if you leave a loaded gun around young children. It's foreseeable that an accident could happen and they could harm. Okay. What about if William were a 13-year-old who had, unbeknownst to the father, had been contemplating suicide and had used the gun to kill himself at that age? Foreseeable? I'm not sure about that. I haven't looked at the cases from that particular perspective. There are the cases about the 12-year-old kid that went in and grabbed a gun and was playing around with it. And clearly the Oregon courts let that, you know, let that go to a jury. And there was that comment about, you know, at a certain age, children are known to disobey admonitions, warnings, be careful. You know, it is. Here though, Your Honor, the facts in this case are not just that he was 18 years old. Okay. I mean, I'm not saying that, okay, if this would have happened on the last day of his 17th year, we have a different situation than the first day of his 18th year. Okay. I'm not, I'm not arguing that. But what you look at is you look at what is the evidence in the case about this kid at this time when this happened. Okay. He's in school. He's got great grades. He's involved in extracurricular activities. He's excited about going to college. He's, he's, he's involved in things. I got all that. What I'm trying to figure out is your position is that unless the father here, your, your client, unless he was aware of specific signs that William was contemplating suicide or was at particular risk of potentially wanting to kill himself, then none of it is foreseeable. Exactly. And he lawfully possesses the gun. The gun is inside a home. They, they keep saying, you know, unsecured. Yes, it's unsecured in the home, but the home is locked. It's not available to outside parties. So an individual can make a decision who has access to this gun. I'm in a home. I know what my son is like. My son is 18 years old. He's trustworthy. He's never given any indication of acting out. He's never done anything untowards. He makes the decision for both security purposes and for where he's sleeping within the house. He sent the gun where it did. You make a conscious decision about what it is that you're doing. And that is exactly what he did. There are no facts in this case, which would make this a special circumstance of where he would be aware that this was any more than just a complete, unique surprise. And we all understand that there are all these studies about, you know, what kids go through and suicide among teens. Fine. Things like that. But what we're dealing with is, we're dealing with this particular case, this particular date and time. And as a matter of law, we submit that the, that the trial court judge had this exactly right. This was a tragic situation. This was a horrible outcome. This was something that is stunning to both the mother, who is the personal representative of the estate, bringing this case. So let me ask you to distinguish or tell me why I shouldn't distinguish between foreseeability and negligence. That is, negligence depends on various circumstances. And it seems to me the jury could say, you know, if he had it on his own nightstand, not negligent. If he had it in a closet, not negligent. If he left it out on the right by the door, maybe the balance is negligent, not negligent. Why isn't that the way to look at it rather than foreseeability? That is, when one has a gun, there are all kinds of different levels of care one might take. And why shouldn't the jury decide whether it's negligent, not whether it's unforeseeable that things can go wrong with guns? Because the risk that is to be avoided or, I mean, basically, you know, there's five elements under the Oregon negligence statute, foreseeability, you know, being one of them. And then Oregon courts have talked about the interchange between some of the elements. In this particular case, there has to be a negligent invasion creating a risk. There has to be, the conduct itself has to be unreasonable in light of the risk. You have to look at the particular risk. And the particular risk is, you know, taking his own life. And that's the question is, was the conduct of defendant greeting the father unreasonable, you know, in light of that risk? And here, the position is, that risk is not the general type of potential incidents or injuries that would produce negligence on behalf of the defendant greeting. If somebody broke in, maybe, and used the gun. If, you know, I mean, there's different matters. And I think you have to go back and look at the cases because suicide has historically forever been considered an intervening cause that cuts everything off. And I'm not taking that position today. But it still starts the analytical groundwork of, you have to look at the act that caused the damages, which was the decision to take his own life and then move backwards. And take a look at the circumstances in this case to make a determination as to whether these circumstances are special enough that they take away that intervening intentional act of the defendant to harm himself. And in this case, I think the trial court got it exactly correct. The thing that was probably the biggest impact on the grant, the motion for summary judgment, is we took depositions. And we put the mom under oath. And despite what she alleged in her complaint about all this advanced knowledge that he was at risk, that he was a child at risk, and things like that, it came out, and I listed it in my brief, all of the things that the mother said. This was a complete shock to everyone. Nobody saw this coming. She didn't know. She says nobody ever diagnosed him as being suicidal. He never said to anybody he was suicidal. He was doing great in school. This was one of those mental tragedies that occurred inside William's head with no indications leaking out to anybody. The school people, the counselors, the counselors that he saw, nobody saw anything that would indicate that this was a potential happening. And so we submit that the trial court had it exactly right. This tragedy should be over for both of these parents and not continue. So you're going to share time with your colleague? I'll give the rest of my time to my colleague. Thank you, your honors. Okay. May it please the court, esteemed colleagues. Appellees, the Lane County government, parole and probation, and division manager, Mr. Dumeier, submit that the highly charged allegation that appellees ratified a decision that led to an 18-year-old's suicide should be dismissed. Ratification requires a plaintiff to show the authorized policy makers approved subordinates decision and the basis for it. The approval must be conscious and affirmative. Appellees should be dismissed because there was no policy about home storage of privately owned firearms when Mr. Manson Greening committed suicide. However, there is now. Home storage of privately owned duty weapons is now mandatory per policy. You'll find that supplemental excerpt of record, page four and five. The change in policy cuts against the finding of ratification. After Mr. Manson Greening's death, the union representing parole and probation employees work collaboratively with appellees to create policy that now requires safe storage of firearms, regardless of whether they are privately or publicly owned. You'll also find that at page four and five of supplemental excerpt of record. The appellees have always trained about safe storage practices at work, but now appellees train employees on the importance of safe home storage practices too. You'll find that excerpt of record, page 524. Appellant argues that it was their complaint that forced the appellees to change their policy. However, the only declaration on point shows that the final draft of the new policy predates the complaint. That's excerpt of record, page five. Appellant then changed her argument to say it was her attorney's tort claim notice that compelled appellees to draft the new policy. This argument must fail as well because even assuming appellant's tort claim notice had a compelling effect as alleged, the decision to enact the new policy was still done in support of their proposition that failure to discipline means ratification. First, appellant relies on IOPA. IOPA is about a supervisor who was informed of detailed negotiations of selective prosecution throughout the entirety of the act. Unlike supervisor in IOPA, Mr. Dumeier did not know of co-appellee's gun storage practices at home, did not know that co-appellee's adult non-custodial son lived with him full-time, and did not know that his son had suicidal ideation. You'll find that at supplemental excerpt of record, page four. In Gomez, the court writes a policymaker's pronouncement that he has not or will not discipline officers that retaliate against a prison litigator is sufficient evidence of a policy or custom. However, the context of that was aware of at least four separate acts of retaliation and was personally responsible for retaliation by reducing the number of law clerks below the minimum number required. The court found that by refusing to discipline anyone involved in the four or more separate circumstances, a policy or custom was established. Opposite from Gomez, the record in this case shows a policy and practice of disciplining inmates for failing to secure their firearms. Let me ask you a question, Mr. Tapia. Yes, sir. As I read the district court's order, the district court didn't really have much to say about ratification, if I'm not mistaken. And the district court seemed to say that for purposes of the constitutional claim, the due process claim, that there was one, no affirmative act, and two, there was insufficient allegation, they're showing a deliberate indifference. So there's just no constitutional claim. If we would agree with that, do we need to even touch upon ratification? Your Honor, I don't believe you would under that circumstance. Do you have a view on either of those two points? No, Your Honor, not at this point. I would like to finish my analysis just in case the question of ratification is one that this court decides on the merits. Opposite from Gomez, the record in this case shows a policy and practice of disciplining inmates for failing to secure their firearms. Even plaintiff's lead counsel conceded that Lane County has a gun storage policy, provides gun safes at work, and disciplines its employees for failing to use them. The admission is found in his oral argument transcript, excerpt of record page 58. One of plaintiff's lead witnesses, Linda Hamilton, concedes the same, excerpt of record page 128. The record also discloses several examples of Lane County employees being disciplined for judgment in the use of firearm, excerpt of record 696 to 705. These facts cut against appellant's ratification argument. If the pattern shows a history of disciplining other inmates' unsafe storage practices. Mr. Tadby, you're over your time. Thank you. Thank you very much. We appreciate your argument. Let's go back to the appellant. I think you have a little bit of time left for rebuttal. Thank you, Your Honors. Very quickly. There is a state-created danger claim that should be resolved by the jury here. Counsel for Mr. Greening admitted that his client made a conscious decision to expose his son to the danger of his unattended loaded handgun. Exposing that William Manstrom Greening could not have committed suicide without access to that handgun. You really think that his father wanted him to kill himself? I just think your argument on this is really, it's just strange. I find it kind of offensive, actually. The standard for deliberate indifference in this context is basically equivalent to intent. You have to intend to expose someone. There is no way his father wanted him to get that gun and to kill himself. I just don't see how you're making that argument. The intent that's required is to expose someone to the danger, and the danger is the gun could accidentally go off. It could be misused. That is the danger. And he intentionally wanted something bad to happen to his son, whether it was accidental or intentional. Come on. That is really just an offensive argument, sir. You're applying the wrong standard. If you look at Wood v. Ostrander, in that case, the officer didn't intend for the woman he abandoned in a high crime area to take a ride with a rapist and be raped. If you look at the Grubbs case, the supervisor didn't intend for that registered nurse to be assaulted by the violent sex offender, but they put them in danger. And they knowingly put them in danger. So harm was foreseeable. The same is true here. Mr. Greening knowingly put his son in danger by etc. And if it's unreasonable to leave a gun out in a room full of police officers who know how to handle weapons, which is what Lane County's rule at the office is, because it's dangerous, then Mr. Greening knew he was exposing his son to danger when he left that handgun out. That is the state created danger argument. This case returned to the trial court for trial by a jury. Okay. Thank you, counsel. We appreciate all the arguments this morning on this case, and it's submitted at this time. Thank you very much. I believe that ends our session because the remaining two cases, McLean v. Salisbury and Pacific Gulf Shipping v. Gregoras Shipping, those two cases have been submitted on the briefs and records. So thank you all very much, and that ends our session for today. Thank you, your honors. Report for this session now stands adjourned. Thank you, everyone.
judges: Boggs, Paez, Watford